## A01A0917. BOB DAVIDSON & ASSOCIATES, INC. et al. v. NORM WEBSTER & ASSOCIATES, INC.

### (553 SE2d 365)

BARNES, Judge.

Norm Webster & Associates, Inc. ("NW&A") sued Robert Davidson, Jr., Joseph Mark Davey, and Bob Davidson & Associates, Inc. ("BDA"), alleging among other things that the defendants breached a fiduciary trust by misappropriating a corporate opportunity. The trial court granted summary judgment to NW&A on its breach of fiduciary trust count against all three defendants, who then appealed to this Court. Because material questions of fact exist for a jury to resolve regarding this issue, we reverse the trial court's grant of summary judgment.

After NW&A filed its complaint, the defendants answered, denied liability, and counterclaimed for attorney fees, salary, profits, and retirement funds. NW&A moved for partial summary judgment against Davidson on liability for misappropriation of corporate opportunities. All three defendants opposed the motion and moved for summary judgment on NW&A's claim for misappropriation of corporate opportunities, arguing that NW&A was not a corporation and that the account at issue was not a corporate opportunity belonging to NW&A.

NW&A then amended its complaint to add additional claims against Davidson and Davey for breach of fiduciary duty as employees, agents, and partners. In its subsequent reply brief supporting its motion for partial summary judgment and opposing the defendants' motion for summary judgment, NW&A argued that Davidson and Davey owed a fiduciary duty as employees, and Davidson owed the duty as a partner or agent of NW&A.

1. Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 596 (370 SE2d 843) (1988). On appeal from a grant of summary judgment, this Court conducts a de novo review of the record, construing the evidence and all inferences therefrom in favor of the nonmoving party. *Maddox v. Southern Engineering Co.*, 231 Ga. App. 802, 803 (500 SE2d 591) (1998); *Lane v. Spragg*, 224 Ga. App. 606 (481 SE2d 592) (1997).

Viewed in this light, the record shows that Norman Webster began representing American Yard Products, Frigidaire's predeces-

sor, at Lowe's in the early 1990s and employed Davidson as an independent contractor in 1991 to represent Frigidaire at Home Depot. Davey began working with Davidson and Webster in 1994 to provide customer service and technical support. In October 1995, Webster incorporated the business, forming NW&A and issuing stock to himself, Davidson, and his three children, James Webster, Lisa Webster, and Lynne Webster Thornton. Webster died in May 1996. In January 1997 Davey purchased shares of NW&A's stock.

The fiscal year for selling Frigidaire lawn mowers usually ran from November 1 to the following October 31, but Frigidaire did not have a formal contract with NW&A. Instead, Frigidaire could terminate its relationship with NW&A at any time. Frigidaire executive Cook testified that the company was reevaluating and reducing its use of outside sales representatives in 1996, and he had decided to terminate its relationship with NW&A. After Webster died in the middle of the 1995/1996 selling season, however, he agreed to continue the relationship for another year, the 1996/1997 selling season. Cook decided to continue for one more year both because he did not want the Webster children to suffer a loss of income in addition to losing their father, and because the additional time would allow Frigidaire to make a smooth transition to a new in-house representative who would handle the Home Depot account. Cook further explained that he did not consider Frigidaire as doing business with NW&A, the company, but with Webster himself for the Lowe's account and Davidson for the Home Depot account. The entity NW&A was not important to Frigidaire, according to Cook, because the relationship was a "very personal thing" with Webster for Lowe's and Davidson for Home Depot. Cook said he thought NW&A could not represent Frigidaire adequately without Norman Webster and Davidson. A sales and marketing executive with Frigidaire testified that he would have been "apprehensive" about using NW&A if Davidson were not there, because he wanted someone with a lot of experience working with Home Depot, and none of the Webster family members could have handled the account.

Davidson testified that all of the shareholders knew the relationship between NW&A and Frigidaire was ending, that the company's remaining accounts dried up, and that everyone involved understood and anticipated that NW&A would cease operating once the 1996/1997 season ended, in November 1997. While Davey concurred that all the parties agreed they would shut down NW&A at the end of the season, the three Webster children denied that the parties had agreed to shut down the business after the season ended. Thornton worked part-time in the office, Lisa Webster worked full-time in the office, and James Webster worked full-time on sales and service after Webster died.

Meanwhile, NW&A continued to service the Frigidaire/Home Depot account during 1997, which involved resolving any issues that arose in the relationship between Home Depot and Frigidaire (NW&A's only remaining big account), answering calls, ensuring that inventory was delivered, and attending trade shows and meetings, among other things. Davidson testified that servicing the account for the current year included attending Home Depot's yearly meeting in Louisville, at which business was conducted with an eye toward the next season. He attended, he said, despite knowing that he would not be handling Frigidaire's Home Depot account for the 1997/1998 season, because his understanding was that Frigidaire could end the current relationship at any time and he needed to represent them while NW&A continued to receive commission checks through November 1997. Davey testified that the work they did for Frigidaire in 1997 was both geared toward the next season and part of servicing the existing season.

The three Webster children testified that Davidson first told them in May 1997 that Frigidaire had fired all of its outside representatives, including NW&A, but that he would try to get the company to change its mind for the upcoming 1997/1998 season. Davidson and Frigidaire executives testified that Frigidaire approached Davidson at the end of June and asked him to represent Frigidaire to Home Depot for the 1997/1998 season, as well as a new line of weed-eaters the company just acquired, because Davidson had an established relationship with Home Depot and already understood how their buying process worked. Davidson testified that this offer came "out of the blue," with no previous discussions about continuing the business past the 1996/1997 season. A Frigidaire executive said the company approached Davidson first about representing it to Home Depot the next season and he had to talk Davidson into accepting the business.

In early July 1997, Davidson accepted the offer. Both Davidson and Cook testified that the offer was made to Davidson personally, not to NW&A, and Cook testified that NW&A could not have handled the account without Davidson. He explained that the relationship among sales representative, manufacturer, and customer was a personal one, which he extended to Davidson because of his longstanding relationship with Home Depot. Another Frigidaire executive testified that where Davidson worked was not the company's concern; Davidson was "considered the expert for Home Depot" who had "been dealing with Home Depot . . . in excess of 25 years and, therefore, knows the people, the organization, and the methods." In fact, after Webster died in May 1996, the company raised the possibility of having Davidson come in-house, but he was not interested. Davidson was the only remaining outside sales representative Frigidaire used

beginning in the 1997/1998 season, all the other positions having gone in-house.

Davidson testified that he did not announce his new deal to the Webster children, because NW&A was shutting down and the offer was made to him personally, not to the company. He also testified, however, that he did not try to hide the fact that he would be representing Frigidaire to Home Depot for the 1997/1998 season, receiving correspondence at NW&A offices and having telephone conversations in the common room where everyone worked. The three Webster children, on the other hand, testified that Davidson first told them he would try to solicit the next year's business for NW&A, then told them he would only be acting as temporary liaison between Home Depot and Frigidaire's new in-house representative for three to six months. They discovered that Davidson was going to be Frigidaire's national sales representative to Home Depot only when they intercepted a faxed announcement on August 15, 1997.

Davidson incorporated BDA and leased new office space in August 1997, and in September 1997 he purchased NW&A's office equipment and furniture for $2,750 to move to his new office. James Webster testified that NW&A completed the sale, including all of the company's records, despite believing that Davidson had lied to them about the account, because the parties had reached an agreement before the discovery and it "wouldn't be very gentlemanly" to refuse the sale. He also testified that Davidson "forbid" him or anyone else at NW&A from contacting Frigidaire or pursuing any other accounts for Frigidaire. While he "had a problem" with those directions, Webster did not challenge Davidson about them.

Davidson testified that he did not begin compiling information for Frigidaire's 1997/1998 sales forecast until October 1997, after NW&A had given up its lease and shut its doors. Davey also went to work for BDA.

James Webster testified that Davidson told him to stop calling on other customers, and because he was the boss, Webster did not call on other accounts. While he had tried to find another product to represent or another business opportunity for NW&A, he was not successful, and as of April 1999, the company's only business was the prosecution of this lawsuit. In October 1997, NW&A fired Davidson; in February 1998, NW&A distributed 1997 profits of $40,014.74 to each of the three Webster children and $120,000 to Norman Webster's widow. The company deposited the rest of the profits, $180,000, with its attorneys. Neither James Webster nor Lisa Webster was employed as of their depositions in April 1999. NW&A contends that Davidson's company grossed more than $300,000 on the Home Depot account for the 1997/1998 season, and that it should share in those proceeds.

In granting summary judgment to NW&A on breach of fiduciary duty against Davidson, Davey, and BDA, the trial court considered nine depositions and made numerous factual findings. Its last finding of fact concluded that "Bob Davidson and Joseph Mark Davey converted the Frigidaire contract to their own use under the new corporation and took it away from Norman Webster and Associates Inc. . . . ." In its conclusions of law, the trial court stated:

> The issue in this case is whether some of the members in one entity may negotiate and obtain a lucrative contract for that entity and then create their own new entity taking that contract with them, without any liability to the first entity. Clearly such action is a breach of fiduciary trust and the individuals and new entity are liable to the original entity.

The trial court then discussed case law defining what constitutes a "corporate opportunity," and continued:

> Here the opportunity was the normal business of Norman Webster and Associates Inc., and the opportunity actually existed. Bob Davidson acted as President of Norman Webster and Associates Inc., in negotiating the new contract with Frigidaire. Only after the transaction was negotiated did Bob Davidson form a new company and take the contract. Clearly this is a breach of fiduciary trust and each of the Defendants is liable to the Plaintiff for the damage caused by this act. . . . The contract involved, under the undisputed facts, was a corporate opportunity capable of being performed by Norman Webster and Associates Inc. The fact that Bob Davidson told Norman Webster and Associates Inc., that Frigidaire had terminated Norman Webster and Associates Inc., and that the "partners" consulted as to what they would do is not material because Bob Davidson's statement was incorrect. . . . Therefore, Plaintiff's Motion for Summary Judgment on breach of fiduciary trust against each Defendant is granted.

The defendants appeal the trial court's grant of partial summary judgment to NW&A on its breach of fiduciary duty claim, but do not appeal that portion of the trial court's order denying their motion for summary judgment. They enumerate several errors, some of which we consider together, arguing that the trial court erred (1) by finding that BDA and Davey as employees were liable for breach of fiduciary duty by misappropriating a corporate opportunity; (2) by finding that Davidson as an officer was liable while also concluding that a factual issue existed as to whether NW&A was actually a corporation; (3) in

ruling against them without giving them adequate notice and opportunity to respond; and (4) by considering inadmissible evidence.

2. OCGA § 14-2-831 (a) (1) (C) provides that a corporation may sue an officer or director for "[t]he appropriation, in violation of his duties, of any business opportunity of the corporation." "Thus, the first step in a successful [OCGA § 14-2-831] suit is the establishment of a defendant as an officer or director, present or former, of the suing corporation." *Sofate of America v. Brown*, 171 Ga. App. 39, 42 (5) (318 SE2d 771) (1984). It is apparent from the record that neither Davey nor BDA was a corporate officer or director, and therefore the trial court erred in granting summary judgment against them for breach of fiduciary duty due to misappropriation of corporate opportunity.

3. As to Davidson, the Supreme Court of Georgia first considered the duty of a corporate officer, partner, or employee not to appropriate a "business opportunity" of his or her corporation in *Southeast Consultants v. McCrary Engineering Corp.*, 246 Ga. 503 (273 SE2d 112) (1980). It adopted a two-step process for determining the ultimate question of when liability for wrongful appropriation of a business opportunity should be imposed.

> First, a court must determine whether the appropriated opportunity was in fact a business opportunity rightfully belonging to the corporation. If a court finds that the business opportunity was *not* a corporate opportunity, the directors or officers who pursued the opportunity for personal benefit are immune from liability. However, if the court finds that the business opportunity was a bona fide corporate opportunity, the court must determine whether the corporate official violated a fiduciary duty in appropriating that opportunity. Regarding the second step[,] . . . liability should not be imposed upon the acquiring officer if the evidence establishes that his acquisition did not violate his fiduciary duties of loyalty, good faith, and fair dealing toward the corporation.

(Citations and punctuation omitted; emphasis in original.) Id. at 508 (2).

A decade later, the Supreme Court further elucidated the burden of proof in a corporate opportunity case.

> [T]he threshold question is whether an opportunity presented to a corporate fiduciary is a "corporate" opportunity. That factual determination is to be made from all the relevant facts and circumstances. The burden of proof with

regard to the threshold question rests upon the party attacking the acquisition. Liability is not to be imposed upon the fiduciary unless the evidence establishes that the fiduciary violated his fiduciary duties of loyalty, good faith and fair dealing toward the corporation. Thus, the second step involves close scrutiny of the equitable considerations existing prior to, at the time of, and following the officer's acquisition. The burden of proof on the questions of good faith, fair dealing, and loyalty is placed upon the officer who appropriated the opportunity.

(Citations and punctuation omitted.) *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584, 587 (2) (397 SE2d 699) (1990).

"A business opportunity arises from a 'beachhead' consisting of a legal or equitable interest or an 'expectancy' growing out of a preexisting right or relationship." *United Seal &c. Co. v. Bunting*, 248 Ga. 814, 815 (285 SE2d 721) (1982). In *United Seal*, the trial court denied the company's petition for an interlocutory injunction, and the Supreme Court considered "whether dealing with certain customers amounted to 'business opportunities'" in a suit against three former corporate officers. Id. at 814. The Court concluded that "the customers of United Seal did not constitute business opportunities." Id. at 816. Although the company had dealings of long standing with the customers, whose sales accounted for a large portion of its income, no contractual arrangement existed between the company and customers; the customers had no exclusive arrangement with the company; and "the opportunity suggested was an ongoing [one] with no finite aspect." Id.

Further explicating *United Seal*'s holding, the Supreme Court held that "the opportunity of dealing with certain customers did not constitute a business opportunity." *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376, 378 (2) (297 SE2d 473) (1982). Because an accountant's servicing of his former corporation's clients did not constitute a business opportunity, the Court did not need to determine whether the accountant violated any of his fiduciary duties while an officer. Id.

Therefore, NW&A must first prove that the relationship between Frigidaire and Davidson for the 1997/1998 season constituted a "corporate opportunity." "Only if we answer affirmatively must we address the issue[ ] of whether [Davidson] violated any of his fiduciary duties in relation to these 'opportunities' while he was an officer." *Singer*, supra; *Jenkins v. Smith*, 244 Ga. App. 541, 542-543 (1) (535 SE2d 521) (2000). Because of evidence that, among other things, the shareholders of NW&A expected the corporation to cease operating at the end of the 1996/1997 season; that Frigidaire was interested

only in reaching an agreement with Davidson personally; and that Frigidaire would not have worked with NW&A without Davidson, the trial court erred in granting summary judgment to NW&A against Davidson on its count alleging breach of fiduciary duty due to misappropriation of corporate opportunity. Because Davidson did not appeal the issue, we do not decide whether the trial court erred in denying his motion for summary judgment on the same ground.

4. Even though Davey cannot be liable to NW&A for breach of fiduciary duty due to misappropriation of corporate opportunity, NW&A argues that we should affirm the trial court's grant of summary judgment against him because he is liable for breach of fiduciary duty as an employee. NW&A argues that Davidson can also be liable for such a breach as an employee.

> [A]n employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed. . . . [H]e is not, however, entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.

(Citations and punctuation omitted.) *E. D. Lacey Mills, Inc. v. Keith*, 183 Ga. App. 357, 362-363 (9) (359 SE2d 148) (1987). Pretermitting whether this issue was properly before the trial court, NW&A having argued it only in its reply to the defendants' response to its motion for partial summary judgment, the record here contains sufficient evidence to create a jury question as to whether BDA was a competing or rival business, or whether Davey's actions constituted direct competition, in light of testimony that NW&A was shutting down at the end of the current season and that Frigidaire's sales representative offer was made to Davidson personally. Thus, the trial court's grant of summary judgment to NW&A against Davey cannot be affirmed for this reason either.

5. In light of the foregoing, the appellants' remaining enumerations of error are moot.

*Judgment reversed. Smith, P. J., and Phipps, J., concur.*

DECIDED AUGUST 2, 2001.

*D. Robert Autrey, Jr., Marilyn F. Dye*, for appellants.
*Kilpatrick Stockton, William R. Poplin, Jr., R. Randy Edwards,*

*Geoffrey B. Dendy, John W. Alden, Shawn D. Rodda, Hendrick, Rascoe & Reynolds, Frank O. Hendrick III*, for appellee.